UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------X

ELVIRA D'AMORE,

        Plaintiff,

- against -

CIBC and CIBC WORLD MARKETS,

        Defendants.

------------------------------------------------------X

07 CV 600

ECF CASE / Judge Casey

COMPLAINT

PLAINTIFF DEMANDS A TRIAL BY JURY



Plaintiff Elvira D'Amore ("D'Amore" or "plaintiff"), through her attorneys, Vladeck, Waldman, Elias & Engelhard, P.C., complains of defendants CIBC and CIBC World Markets (collectively "CIBC" or "defendants") as follows:

## NATURE OF THE ACTION

1. Plaintiff brings this action to remedy sex and pregnancy discrimination in employment, in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq. ("Title VII"); the New York State Executive Law § 290 et seq. (the "Executive Law"); and the Administrative Code of the City of New York § 8-101 et seq. ("City Law").

2. Plaintiff also brings this action pursuant to the Family and Medical Leave Act, 29 U.S.C. § 2601 et seq. ("FMLA"), to remedy defendants' denial of benefits to which she was entitled under the FMLA and to remedy defendants' retaliation against her for engaging in activity that is protected under the FMLA.

3. Plaintiff seeks injunctive and declaratory relief, compensatory and punitive damages, and other appropriate legal and equitable relief pursuant to Title VII, the FMLA, the Executive Law, and the City Law.

242798 v2

## JURISDICTION AND VENUE

4. This Court has jurisdiction pursuant to § 706(f)(3) of Title VII, 42 U.S.C. § 2000e § 5(f)(3).

5. This Court has jurisdiction over plaintiff's FMLA claim under 29 U.S.C. § 626(c) and 28 U.S.C. § 1331.

6. Pursuant to 28 U.S.C. § 1367, the Court has supplemental jurisdiction over plaintiff's claims brought under the Executive Law and the City Law.

7. Plaintiff filed a charge of discrimination with the United States Equal Employment Opportunity Commission (the "EEOC") on or about May 2, 2006, complaining of the acts of sex and pregnancy discrimination alleged herein. On or about November 13, 2006, the EEOC issued plaintiff a notice informing her of her right to sue defendants in federal court. Plaintiff has thus complied fully with all prerequisites required by Title VII.

8. Pursuant to § 8-502(c) of the City Law, prior to filing this Complaint, plaintiff served a copy of the Complaint on the City of New York Commission on Human Rights and the Corporation Counsel of the City of New York.

9. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because the unlawful practices complained of herein occurred within the Southern District of New York and defendants regularly do business within the Southern District of New York.

## PARTIES

10. Plaintiff is a female who worked for defendants from 1988 until January 10, 2006, when defendants terminated her employment while she was on maternity leave.

11. Defendants CIBC and CIBC World Markets are investment banks that, among other things, help corporate, government and institutional clients raise capital, grow and

invest. Defendants are employers within the meaning of Title VII, the FMLA, the Executive Law, and the City Law.

## FACTS

### Background

12. In or about 1988, CIBC hired D'Amore as an Associate for its Financial Advisory Services division.

13. While working for CIBC, D'Amore earned a Bachelor of Arts degree in Accounting and Information Systems from The City University of New York at Queens College and received professional certifications (Series 7 and 63 licenses) to work in the financial services industry.

14. D'Amore's performance for CIBC was consistently excellent and, over the next approximately 17 years, CIBC promoted her to positions with greater responsibility. For example, in 1993, CIBC promoted D'Amore to Assistant Vice President of Global Asset Based Finance and, in 2000, CIBC promoted her once again to Executive Director of Structured Products. Over the past approximately ten years, D'Amore's responsibilities centered around CIBC's leasing portfolio, which was part of the company's Structured Products division.

15. CIBC's leasing portfolio included extremely complex, long-term leases (typically 20-30 year terms) of transportation assets such as aircraft, vessel, rail and other equipment worldwide.

### CIBC Induces D'Amore To Remain With The Company

16. In or about December 2003, CIBC exited the leasing business and closed its Structured Finance division. CIBC dismissed many of the employees in the division. However, CIBC was still responsible for maintaining its approximately $1 billion leasing

242798 v2

3

portfolio through 2029. The portfolio included dozens of leases that CIBC was required to manage continuously.

17. Rather than terminate D'Amore's employment, CIBC retained her to help ensure the proper management of the portfolio. In December 2003, May 2004 and October 2004, CIBC offered D'Amore substantial written guaranteed bonuses to remain employed by defendants.

18. On information and belief, CIBC's written business plans included continuing D'Amore's position for the foreseeable future despite all of the changes that had been occurring within the company. Indeed, Peter Martin ("Martin"), D'Amore's supervisor, told her that, despite exiting the leasing business, CIBC would need her skills and leasing expertise even if defendants decided to sell or transfer the leasing business to a third party.

19. CIBC also needed D'Amore's expertise to respond to two ongoing tax audits concerning the leasing business.

20. CIBC's main offices were located in Toronto, Canada. In or about October 30, 2004, CIBC shifted supervisory responsibility for the New York office leasing portfolio from its New York office to its Toronto office. That transfer did not affect D'Amore's job duties.

21. In or about June 2005, Martin notified D'Amore and her colleagues in New York that CIBC wanted to retain D'Amore's group for the foreseeable future and that CIBC would offer these employees the same guaranteed bonus agreements it had offered in October 2004.

242798 v2

4

### D'Amore Announces That She Is Pregnant

22. Also around June 2005, D'Amore announced that she was pregnant and that she would be going on maternity leaving beginning in the Fall of 2005. She also asked Martin whether she could work from home one day per week during the late stages of her pregnancy. Martin did not respond to her request.

23. Shortly after D'Amore announced her pregnancy, Martin requested that D'Amore train Patricia Jankovic ("Jankovic") to perform her duties while she was on maternity leave. Jankovic was stationed in CIBC's Toronto office. D'Amore agreed.

24. D'Amore also offered to be available to Jankovic during her maternity leave to address any critical issues. Martin told D'Amore that would not be necessary because, according to him, D'Amore should be focusing on more important issues, referring to the upcoming birth of her child.

25. In or about September 2005, three months after D'Amore announced her pregnancy, she called John Penhale ("Penhale"), Martin's supervisor, to ask why CIBC had not yet presented her with the guaranteed bonus agreement that Martin had promised back in June. Shortly thereafter, CIBC sent D'Amore an offer letter; however, contrary to Martin's statements, the offer did not contain a guaranteed bonus.

26. D'Amore spoke to Martin, Penhale and Annette Phillips of CIBC's Human Resources Department, about CIBC's failure to offer her a guaranteed bonus, as it had done in the past and as Martin had promised. All three assured D'Amore that, despite the lack of a guarantee, she would receive a bonus of approximately $200,000 for the fiscal year ending October 2006. Moreover, Penhale assured D'Amore that, once the tax audits had concluded, she

would be offered the option of remaining with CIBC on a part-time basis. Based on these assurances, D'Amore accepted CIBC's offer.

### CIBC Terminates D'Amore's Employment While She Is On Maternity Leave

27. On or about October 6, 2005, D'Amore went on maternity leave.

28. During her leave, she received numerous calls and e-mails from Jankovic asking D'Amore for assistance in performing her former duties that had been temporarily assigned to Jankovic. D'Amore also kept in contact with CIBC's external tax counsel regarding the ongoing audits. To D'Amore's knowledge, the duties she performed were critical to the ongoing maintenance of CIBC's $1 billion leasing portfolio and to the audits.

29. Nonetheless, on or about January 10, 2006, approximately one week before D'Amore was to return to work from maternity leave, CIBC terminated her employment.

30. While D'Amore was on maternity leave, Penhale arranged a conference call with D'Amore. He started the call by stating, "I'm sure it's much harder now with two kids." Penhale then proceeded to tell D'Amore that CIBC had eliminated her position because the tax audits had concluded.

31. In fact, a few days earlier, CIBC's outside tax counsel had called D'Amore regarding numerous outstanding tax audit issues. In other words, on information and belief, Penhale's statements to D'Amore regarding the reason for the termination of her employment were false.

32. CIBC did not offer D'Amore the opportunity to stay and look for another suitable position with defendants, as had been done previously with other employees in the Structured Products division whose jobs had allegedly been eliminated.

33. On information and belief, CIBC transferred D'Amore's duties to Jankovic, the same employee that CIBC had asked D'Amore to train to perform, her duties "temporarily" while D'Amore was on maternity leave.

34. On information and belief, Jankovic was approximately 27 years old and had not recently been pregnant or gone on maternity leave. Jankovic had only a rudimentary knowledge of leasing and was considerably less qualified than D'Amore, or arguably not qualified, to manage the leasing portfolio.

35. Moreover, on information and belief, D'Amore was the only employee in the New York office who was dismissed at that time. Her two colleagues, who also worked on the leasing portfolio and to whom CIBC had also sent similar "no-guarantee" letters, were allowed to continue their employment. One of these colleagues was a male and the other is a female who had not recently been pregnant.

36. On January 13, 2006, M. Elizabeth Byck ("Byck"), D'Amore's former supervisor, wrote to Penhale and Gary Brown ("Brown"), CIBC's Chief Operating Officer, expressing concern about defendants' decision to terminate D'Amore's employment. In particular, Byck wrote that no one else within CIBC had the "requisite expertise and experience" to handle the ongoing issues with the CIBC's leasing portfolio. Byck also wrote:

> To be clear, the need for such expertise and experience does not disappear with the finalization of the tax audit that is currently underway. Issues will continue to arise over the life of the portfolio that will require an in-depth understanding of all aspects of these transactions.
>
> Over the years, there have been numerous companies that have decided for various reasons to exit the leasing business. In every case that I'm aware of, recognizing the unique nature of the transactions and of the issues that they give rise to, those companies have either retained people with the necessary expertise to manage their portfolio or have retained experienced third parties to manage their portfolio on their behalf.

242798 v2

7

37. On information and belief, CIBC's outside tax counsel also sent an e-mail to defendants protesting the termination of D'Amore's employment because her position was necessary to assist with the ongoing tax audits.

38. On information and belief, the reason CIBC terminated D'Amore's employment was because of her gender and pregnancy and because she had exercised her right to take maternity leave.

## FIRST CAUSE OF ACTION

(Title VII - Discrimination)

39. Plaintiff repeats and realleges paragraphs 1 through 38 of this Complaint as if fully set forth herein.

40. Defendants discriminated against plaintiff in the terms and conditions of her employment based on her gender and/or pregnancy in violation of Title VII.

41. Defendants acted with malice and/or reckless indifference to plaintiff's statutorily protected rights.

42. As a result of defendants' discriminatory acts, plaintiff has suffered, is suffering, and will continue to suffer irreparable injury, monetary damage, mental anguish, emotional distress, humiliation and other compensable damage unless and until this Court grants relief.

## SECOND CAUSE OF ACTION

(FMLA – Denial of Benefits)

43. Plaintiff repeats and realleges paragraphs 1 through 42 of this Complaint as if fully set forth herein.

44. Defendants have interfered with, restrained, and denied plaintiff's exercise of her rights under the FMLA to return to her position or an equivalent position after her pregnancy leave, in violation of the FMLA.

45. Defendants knew that their actions constituted an unlawful violation of the FMLA and/or showed reckless disregard for plaintiff's statutorily protected rights.

46. Plaintiff has suffered, is now suffering, and will continue to suffer irreparable injury and monetary damages as a result of defendants' unlawful practices unless and until this Court grants relief.

### THIRD CAUSE OF ACTION

(FMLA – Retaliation)

47. Plaintiff repeats and realleges paragraphs 1 through 46 of this Complaint as if fully set forth herein.

48. In violation of the FMLA, defendants retaliated against plaintiff for her exercise of her rights under the FMLA.

49. Defendants knew that their actions constituted an unlawful violation of the FMLA and/or showed reckless disregard for plaintiff's statutorily protected rights.

50. Plaintiff has suffered, is now suffering, and will continue to suffer irreparable injury and monetary damages as a result of defendants' unlawful practices unless and until this Court grants relief.

### FOURTH CAUSE OF ACTION

(Executive Law – Discrimination)

51. Plaintiff repeats and realleges paragraphs 1 through 50 of this Complaint as if fully set forth herein.

52. By the acts and practices described above, defendants have discriminated against plaintiff in the terms and conditions of her employment based on her gender and/or pregnancy in violation of the Executive Law.

53. As a result of defendants' discriminatory acts, plaintiff has suffered and will continue to suffer irreparable injury, monetary damage, mental anguish, emotional distress, humiliation and other compensable damages.

### FIFTH CAUSE OF ACTION

(City Law – Discrimination)

54. Plaintiff repeats and realleges paragraphs 1 through 53 of this Complaint as if fully set forth herein.

55. By the acts and practices described above, defendants have discriminated against plaintiff in the terms and conditions of her employment based on her gender and/or pregnancy, in violation of City Law.

56. Defendants knew that their actions constituted unlawful discrimination on the basis of plaintiff's gender and/or pregnancy and/or showed reckless disregard for plaintiff's statutorily protected rights.

57. As a result of defendants' discriminatory acts, plaintiff has suffered and will continue to suffer irreparable injury, monetary damage, mental anguish, emotional distress, humiliation and other compensable damages.

### PRAYER FOR RELIEF

WHEREFORE, plaintiff respectfully requests that this Court enter a judgment:

(a) declaring that the acts and practices complained of herein are in violation of Title VII, the FMLA, the Executive Law and the City Law;

(b) preliminarily and permanently enjoining and restraining these violations of Title VII, the FMLA, the Executive Law and the City Law;

(c) reinstating plaintiff to the position she held prior to defendants' unlawful conduct;

(d) directing defendants to take such affirmative action as is necessary to ensure that the effects of these unlawful employment practices are eliminated and do not continue to affect plaintiff's employment opportunities;

(e) directing defendants to place plaintiff in the position she would have continued to occupy but for defendants' discriminatory and retaliatory treatment of her, and make her whole for all earnings she would have received but for defendants' conduct, including, but not limited to, wages, bonuses, health care benefits, paid time off, pension, and other lost benefits;

(f) directing defendants to pay plaintiff compensatory damages for her mental anguish and humiliation;

(g) directing defendants to pay plaintiff punitive damages for their intentional disregard of and/or reckless indifference to plaintiff's rights;

(h) directing defendants to pay plaintiff liquidated damages for their violation of her rights under the FMLA;

(i) awarding plaintiff interest and the costs of this action together with reasonable attorneys' fees;

(j) awarding plaintiff damages for any adverse tax consequences; and

(k) awarding such other and further relief as this Court may deem necessary and proper.

## DEMAND FOR TRIAL BY JURY

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, plaintiff demands a trial by jury in this action.

Dated: New York, New York
       January 25, 2007

                                        VLADECK, WALDMAN, ELIAS
                                          & ENGELHARD, P.C.

By: _____
      Valdi Licul (VL 1468)
      Debra L. Raskin (DR 5431)
      Attorneys for Plaintiff
      1501 Broadway, Suite 800
      New York, New York 10036
      (212) 403-7300